Sucn. de Alfredo Ramírez de Arellano, Etc., peticionarios, *v.* Tribunal Superior de Mayagüez, Hon. Ángel Fiol Negrón, Juez, demandado, y Lyvia del Moral Torrellas, interventora.

Número 2332.

*Sometido:* 23 de septiembre de 1957. *Resuelto:* 26 de mayo de 1959.

358

José A. Poventud, Francisco Parra Toro, Carlos García Méndez, José Rosario Gelpí y Amador Ramírez Silva, abogados de los peticionarios; Enrique Báez García, abogado de la interventora, demandante en el pleito principal.

El Juez Asociado Señor Saldaña emitió la opinión del Tribunal.

### En Reconsideración

■ Los hechos de este caso aparecen en nuestra opinión anterior. 80 D.P.R. 148. Allí interpretamos el pacto sobre intereses que se consignó en la escritura de hipoteca tomando en cuenta: (1) el texto literal de sus cláusulas; (2) la conexión entre la frase "vigencia del préstamo" y las otras cláusulas del contrato; (3) la fijación con carácter esencial de un término o plazo de tres años para el vencimiento del débito; y (4) las normas de interpretación de los contratos contenidas en nuestro Código Civil. Con referencia a dichos factores, aisladamente considerados, declaramos que la intención o voluntad común de las partes al perfeccionarse el contrato fue la siguiente: ". . . *acordar el pago de intereses únicamente por el tiempo de la duración del contrato.*" Es decir, resolvimos que ". . . no hubo pacto expreso relativo a intereses al 9% después del vencimiento del débito o por concepto de mora", y que ". . . constituiría una distorsión del sentido normal de las palabras decir que vigencia del préstamo aquí significa 'hasta el total reintegro o pago definitivo de la deuda' o 'mientras dure la deuda', pues la obligación tenía una fecha de vencimiento fija." (Pág. 151.) Para fijar así el sentido y alcance del pacto sobre intereses sólo consideramos los elementos interpretativos del contrato que antes hemos señalado. No había ante nos prueba sobre la conducta de las partes en la celebración y vida del contrato, ya que estos criterios de valoración no fueron ofrecidos al juzgador cuando se sometió la moción de sentencia sumaria que presentaron los demandados (aquí peticionarios) en el Tribunal Superior.

En reconsideración se alega en síntesis: (1) que la intención de las partes al usar la expresión "devengando el préstamo durante su vigencia intereses al nueve por ciento . . ." fue pactar intereses mientras el mismo estuviese impagado y que esto queda claramente evidenciado en los términos literales

del contrato; y (2) que para juzgar de la intención o voluntad de los contratantes procede admitir prueba sobre los actos anteriores, coetáneos y posteriores al contrato. Por las razones que ya señalamos en nuestra primera opinión en este caso, creemos que el primer motivo de reconsideración carece de méritos. Y eso basta para reafirmar nuestra decisión de que el tribunal a quo no incurrió en error alguno al declarar sin lugar la moción de sentencia sumaria presentada por los demandados. Como cuestión de derecho, no podía dictarse sentencia sumaria desestimando la acción sobre nulidad de la ejecución hipotecaria, ya que de la faz del contrato de préstamo e hipoteca no surge que el ejecutante tenía derecho a reclamar intereses credituales al nueve por ciento desde la fecha del vencimiento del plazo contractual hasta el total solvendo de la deuda. Véase *Piovanetti* v. *Vivaldi,* 80 D.P.R. 108 (1957).

No obstante, creemos que los peticionarios tienen razón al señalar que no procedía en este recurso de certiorari dar una interpretación *definitiva* del pacto sobre intereses consignado en el contrato de préstamo e hipoteca entre don Francisco del Moral y doña Francisca Sánchez Chavarry. En primer lugar, es innecesario hacer un pronunciamiento adverso a los demandados y *favorable a los demandantes* sobre la interpretación del pacto sobre intereses, a los fines de resolver el incidente de sentencia sumaria envuelto en este recurso. En segundo lugar, no podemos llegar a una conclusión final sobre la interpretación del referido contrato—determinando de hecho que el procedimiento sumario de ejecución hipotecaria fue nulo—sin dar a los demandados la oportunidad de ofrecer prueba en el juicio correspondiente sobre actos anteriores, coetáneos y posteriores al contrato, y también sobre las demás circunstancias relacionadas con el convenio sobre intereses, que en verdad pueden contribuir a la acertada investigación de la intención o voluntad común de los otorgantes.

Dicho en otros términos, al confirmar la resolución del Tribunal Superior negándose a dictar sentencia sumaria a favor de los demandados, era improcedente hacer en apelación un pronunciamiento que equivaldría a dictar sentencia sumaria a favor de los demandantes sobre la cuestión de nulidad del ejecutivo hipotecario. Esto es así porque existe una controversia genuina sobre hechos materiales a la interpretación de la cláusula sobre intereses que sólo puede dirimirse dentro de un juicio plenario. Cf. *Santiago* v. *Tribl. Superior*, 75 D.P.R. 225 (1953) y *Ocasio* v. *San Juan Dock*, 75 D.P.R. 930 (1954). Véase 6 Moore, *Federal Practice* (2a ed.) sec. 56.12.

■■ En efecto, hay que reconocer que los términos del contrato de préstamo e hipoteca en este caso exigen interpretación, pues no son claros y dejan duda sobre "la intención común y evidenciada" de los otorgantes. Sólo pueden ser reputados como términos claros aquéllos que por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones, y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación. Véase la Sentencia del Tribunal Supremo de España de 20 de febrero de 1940, 24 Rev. de Derecho Privado 116. Por tanto, es necesario esclarecer cuál fue la verdadera intención común de los contratantes respecto al pago de intereses sobre el capital del préstamo.(1) Esa cuestión debe ser resuelta, en consonancia con la doctrina sentada en *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108 (1957), después que se ventile el juicio correspondiente sobre la acción de nulidad de la ejecución hipotecaria. En dicho juicio ambas partes podrán, mediante prueba

---

(1) Véanse los arts. 1233 a 1240 del Código Civil (ed. 1930), 31 L.P.R.A. secs. 3471 a 3478; el art. 390 del Código de Enjuiciamiento Civil (ed. 1933), 32 L.P.R.A. sec. 1671; 3 Castán, Derecho Civil Español, Común y Foral (8a ed. 1954) 398–405; Puig Peña, Tratado de Derecho Civil Español, Tomo IV, vol. 2 (1951) 42–48; Puig Brutau, Fundamentos de Derecho Civil, Tomo II, vol. 1 (1954) 291–305; y Manresa, Comentarios al Código Civil Español, Tomo VIII, vol. 2 (5a ed. 1950) 492–539.

que sea pertinente y admisible, ofrecer al juzgador de instancia cuantos elementos de valoración respecto a la conducta de los contratantes y a las demás circunstancias concurrentes sirvan para determinar cuál fue la verdadera "intención común y evidenciada" de los otorgantes. El Tribunal Superior deberá aplicar a los hechos probados las normas de interpretación de los contratos que fijan el Código Civil y la doctrina aplicable.(²) Sólo entonces podrá determinarse si hubo o no pacto expreso *en la hipoteca* relativo al pago de intereses al nueve por ciento después del vencimiento del débito o por concepto de mora. Véanse los arts. 1646 del Código Civil (31 L.P.R.A. sec. 4573) y 232 del Código de Comercio (10 L.P.R.A. sec. 1654). Cf. 11 Manresa, Comentarios al Código Civil Español (5a ed. 1950) 628–631; 2 De Casso y Cervera, Diccionario de Derecho Privado (1954) 2371–2372; Sentencia del Tribunal Supremo de España de 9 de mayo de 1944, 6 Jur. Civ., (2a s.) 645, 664–665.

 Claro está, ningún contrato o acuerdo verbal a que hubiesen podido llegar el acreedor y el deudor respecto al pago de intereses a un tipo mayor que el interés legal, podría tener el efecto de un contrato hipotecario. Como indicamos en *Figueroa* v. *Boneta*, 58 D.P.R. 811, 816 (1941) : "... para serlo, debe otorgarse en escritura pública e inscribirse en el Registro a fin de que, por su propia virtualidad, sirva de base al procedimiento sumario hipotecario."

 Nótese que en este caso no se ejercita la acción de daños y perjuicios basada en el art. 169 del Reglamento (30 L.P.R.A. sec. 1090). Lo que Doña Livia del Moral solicita en su acción contra la Sucn. de Don Alfredo Ramírez de Arellano es que: ". . . se decrete la nulidad del procedimiento

---

(²) Además de las autoridades citadas en el escolio número 1, véanse: *Rutledge* v. *Gill*, 78 D.P.R. 698 (1955) ; *Caballero* v. *Kogan*, 73 D.P.R. 666 (1952) ; *Ramírez* v. *Ramírez*, 65 D.P.R. 544 (1946) ; *Paracchini* v. *Vilá*, 23 D.P.R. 149 (1915) ; *Matson* v. *Goyco*, 18 D.P.R. 702 (1912) ; *Solá* v. *Orcasitas*, 11 D.P.R. 81 (1906) ; Sentencias del Tribunal Supremo de España de 20 de abril de 1944 (6 Jur. Civ., 2a s., 516–532) y de 9 de diciembre de 1944 (9 Jur. Civ., 2a s., 633, 651–652).

ejecutivo sumario . . . y se ordene la devolución de la finca . . . con los frutos producidos o que debió producir la misma . . ." Por ello basta reiterar ahora las normas que establece nuestra jurisprudencia constante y uniforme: (1) es preciso ajustarse de modo riguroso a los trámites y requisitos del procedimiento sumarísimo, incurriéndose en nulidad de lo actuado al apartarse de los mismos; (2) el cobro de intereses excesivos o de otras cantidades que no estén hipotecariamente garantizadas, constituye un error sustancial en perjuicio de los derechos del deudor que vicia de nulidad el procedimiento ejecutivo seguido, aunque tal ilegalidad se deba a un mero error de derecho o a un mero descuido en la investigación de los hechos que figuran en el escrito inicial; y (3) la acción para solicitar la nulidad del ejecutivo hipotecario no prescribe nunca porque ". . . la prescripción no corre contra lo inexistente. El decurso del tiempo no puede insuflar vida a lo que legalmente nunca la tuvo". Véanse, entre otros, *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108 (1957) ; *Gaztambide* v. *Sucn. Ortiz*, 70 D.P.R. 412 (1949) ; *Buil* v. *Banco Popular*, 69 D.P.R. 254 (1948) ; *F. Rodríguez Hnos. & Co.* v. *Aboy*, 66 D.P.R. 525 (1946) ; *Costas* v. *G. Llinás & Co.*, 66 D.P.R. 730 (1946) ; *De Jesús* v. *Assad*, 63 D.P.R. 137 (1944) ; *Figueroa* v. *Boneta*, 58 D.P.R. 811 (1941) ; *Vázquez Vda. de McCormick* v. *Gutiérrez*, 52 D.P.R. 170 (1937) ; *Martorell* v. *Crédito y Ahorro Ponceño*, 42 D.P.R. 655 (1931) ; *Santos* v. *Crédito y Ahorro Ponceño*, 41 D.P.R. 946 (1931).

Dada la situación privilegiada del acreedor ejecutante en la acción hipotecaria, la Ley y el Reglamento le imponen un deber absoluto de veracidad con respecto a los hechos y circunstancias contenidas en el escrito inicial. Art. 38 de la Ley Hipotecaria (30 L.P.R.A. sec. 63) y art. 169 del Reglamento (30 L.P.R.A. sec. 1090). No corresponde al juez investigar o determinar la exactitud o falsedad de los hechos alegados en el escrito inicial para autorizar el procedimiento sumario. Tal responsabilidad recae de lleno sobre el acreedor ejecutante. Y tampoco es necesario para que el procedi-

miento sea nulo que la conducta del ejecutante pueda equipararse al dolo. Basta un error que constituya negligencia porque la aseveración sea contraria a los hechos o a las reglas jurídicas. La tesis contraria, que Guasp sustenta en su obra *La Ejecución Procesal en la Ley Hipotecaria* (1951) págs. 71–73, no encuentra apoyo en la jurisprudencia española ni tampoco en la doctrina de los demás autores.[3] La razón es sencilla: En España el artículo correspondiente al 169 de nuestro Reglamento Hipotecario sólo menciona la *malicia* y omite la *negligencia*. Por tanto, Guasp expresa su opinión personalísima sobre el significado del término "negligencia" en el Reglamento de la Ley Hipotecaria de *Ultramar* (1893), que nunca ha regido en España. No creemos que deba descartarse ahora la norma sentada por nuestra jurisprudencia reiterada sobre este punto para aceptar en su lugar la interpretación del Sr. Guasp. Además es razonable, y aún más necesario, incluir en los conceptos de negligencia y nulidad cualquier error sobre los hechos que el acreedor ejecutante haga constar en el escrito inicial, ya que sus actos pueden mediante el proceso sumarísimo causar la ruina del deudor.

*Se modifica en la forma aquí indicada la opinión que dictamos anteriormente en este caso.* (80 D.P.R. 148). *Debe anularse el auto expedido y devolverse el caso al Tribunal Superior para ulteriores procedimientos compatibles con lo expresado en esta opinión.*

El Juez Asociado Sr. Belaval disintió por las razones que expone en opinión separada.

El Juez Asociado Sr. Santana Becerra está conforme en que el caso sea devuelto al tribunal de instancia para que se esclarezca cuál fue la verdadera intención de los contratantes respecto al pago de intereses y no expresa criterio al presente en cuanto a los demás pronunciamientos de la opinión.

---

[3] La obra de Guasp fue publicada originalmente en artículos que aparecieron en los tomos 14 y 15 de la Revista Crítica de Derecho Inmobiliario (años 1941 y 1942). Véanse las págs. 414, 478, 513 y 593 del tomo 14 y las págs. 9, 84, 225, 297, 383 y 505 del tomo 15.

Opinión disidente del Juez Asociado señor Belaval.

Estamos conformes con el criterio de la opinión de la mayoría que dispone devolver el caso a la Sala sentenciadora para que ésta determine el alcance de la extensión hipotecaria por intereses, objeto de impugnación, de acuerdo con el método provisto por nuestro Código Civil para la interpretación de las cláusulas de un contrato. En todo lo relativo a la extensión hipotecaria por concepto de intereses, el caso de *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108, (Saldaña), (1957), cita precisa a las págs. 115–118, tiene los siguientes resultados prácticos: (1) saca el pacto de intereses en un contrato de hipoteca del articulado correspondiente de la Ley Hipotecaria y lo sitúa en la esfera del Código Civil de Puerto Rico; (2) hace depender la extensión hipotecaria de dichos intereses de la redacción de la cláusula sobre los mismos. Me reafirmo en mi criterio que se trata de una situación totalmente regida por la Ley Hipotecaria y no por el Código Civil. Expuesta brevemente la cuestión: De los dos cuerpos legales, el especial es la Ley Hipotecaria y el general el Código Civil; el Código Civil, que fue adoptado posteriormente a la Ley Hipotecaria, en su art. 1779, 31 L.P.R.A. sec. 5047, pág. 510, dispone que "La forma, *extensión* y efectos de la hipoteca, así como lo relativo a su constitución, modificación y extinción, y a lo demás que no haya sido *comprendido en este capítulo*, queda sometido a las prescripciones de la Ley Hipotecaria, Título 30, que continúa vigente". Contrario a lo que se supone, la Ley Hipotecaria es el derecho supletorio de las disposiciones del Código Civil en cuanto a la extensión de la hipoteca se refiere. De todos modos, la sentencia en reconsideración, al enviar nuevamente a la consideración de la Sala sentenciadora el caso, para que se determine el verdadero alcance de la cláusula referente a intereses de acuerdo con las disposiciones referentes a la interpretación de los contratos en el Derecho civil, en vez de dejarla reducida a la mera literalidad y al arbitrio del juez fijar su alcance, sin más prueba que la que

pueda constituir la propia cláusula interpretada, provee una forma de interpretación más razonable.

Ahora bien, observo que al remitir el caso en la forma limitada en que se hace, se olvida la opinión de la mayoría de instruir a la Sala sentenciadora sobre otro extremo de la prueba, la de la malicia o negligencia en la fiel exposición de los hechos en el escrito inicial del procedimiento sumario, verdadero y único fundamento de la acción que se ejercita.

La disposición que crea esta acción estatutaria, principal, independiente y autónoma de daños y perjuicios, es el art. 169 del Reglamento para la Ejecución de la Ley Hipotecaria de 1893 de Puerto Rico, 30 L.P.R.A. sec. 1090, pág. 89, en aquella parte pertinente a este estudio, que dice así: "El escrito a que se refiere esta sección, autorizado siempre con firma de letrado, enumerará los hechos y las razones jurídicas determinantes de la *certeza*, la *subsistencia* y la *exigibilidad* del crédito y de la competencia del juzgado, señalará categóricamente las *cantidades ciertas cobradas en concepto de intereses o a cuenta del capital de la deuda,* expresando también la *cuantía líquida* de la reclamación que por el solo hecho de iniciar el procedimiento contraerá el acreedor, sujetándose a indemnizar cuantos daños y perjuicios irrogare al deudor o a terceros interesados por *malicia o negligencia en la fiel exposición de los hechos y las circunstancias que ha de apreciar el juez para autorizar el procedimiento y para continuarlo.*" (Énfasis provisto.)

Empezaremos por exponer la teoría de la institución para después comentar la aplicación práctica que de la misma se ha hecho por nuestra jurisprudencia.

Los hechos y razones jurídicas determinantes de la certeza, la subsistencia y la exigibilidad del crédito a que alude la referida disposición, se refieren a la existencia de una hipoteca, a su vigencia y al vencimiento de la misma. La glosa más clara sobre este extremo que hemos encontrado es la de Jaime Guasp, Catedrático de Derecho Procesal en la Universidad de Madrid que dice: "En lo que toca al fundamento de

la pretensión, hay que hacer constar: los hechos y los fundamentos de derecho que justifican la reclamación del acreedor: unos y otros deberán acreditar que el derecho ha nacido efectivamente, que no se ha producido ninguna causa de extinción y que ha llegado a su término natural de vencimiento. A estas tres etapas que integran la vida del crédito, necesarias para que pueda considerársele como perfecto, alude la regla segunda del artículo 131 [art. 169 del Reglamento nuestro] cuando pide que se enumeren los hechos y razones jurídicas determinantes de la certeza, subsistencia y exigibilidad del crédito." Vide: Jaime Guasp—La Ejecución Procesal en la Ley Hipotecaria—pág. 119, (ed. de la Casa Editorial Bosch de 1951).

Es bueno además dejar esclarecido que el señalamiento categórico en cuanto a intereses o capital de la deuda, a que se refiere dicha disposición, es la obligación de declarar *las cantidades líquidas*, que serían las únicas que no podrían constar directamente de los documentos sometidos a examen. Líquida, según el Diccionario de la Lengua Española de la Real Academia Española es aquella condición del crédito que se refiere "al saldo o residuo de cuantía cierta que resulta de la comparación del cargo con la data", siendo la data la "partida o partidas que en una cuenta componen el descargo de lo recibido".

Los conceptos de "malicia" o "negligencia" contenidos en el art. 169 quedan expresamente limitados por el mismo artículo a *"la fiel exposición de los hechos y las circunstancias que ha de apreciar el Juez para autorizar el procedimiento."*

Con relación a este asunto, Barrachina fue el primero en definir lo que debemos entender por "malicia": "La palabra malicia significa intención dolosa, ánimo deliberado de perjudicar a otro faltando a la verdad en los hechos u ocultando lo que debe decirse sincera y honorablemente, malicia que *a priori* no cabe discernir, porque muchos de sus matices y relieve se escaparían del juicio, pero debe medirse y aquilatarse en cada caso concreto, con las circunstancias que le

rodeen por el Juez que hubiese autorizado el procedimiento":
III Federico Barrachina y Pastor, Comentarios a la Ley
Hipotecaria, pág. 157, (ed. del Establecimiento Tipográfico
de J. Armengot e Hijos de 1911).

Morell, sobre el mismo asunto se expresa así: "Esta res-
ponsabilidad que contrae siempre el acreedor tiene su funda-
mento en la naturaleza misma del procedimiento. Se trata
de hacer efectiva directamente la acción real hipotecaria con
intervención del deudor o del tercer poseedor en su caso, pero
sin que se les dé audiencia. Separadamente y en juicio
ordinario pueden alegarse cuantas excepciones se estimen
procedentes, y si de ese juicio resulta no cierta, no exigible o
no subsistente la obligación, cuyo cumplimiento se ha preten-
dido hacer directamente efectivo contra la finca, justo es
que el acreedor quede obligado a indemnizar cuantos daños y
perjuicios, incluso las costas, haya ocasionado con su conducta
al deudor o a los terceros."

"¿Cuando responde el acreedor de tales daños y perjuicios?
Cuando obre con malicia dice la ley. El reglamento de Ultra-
mar hablaba más acertadamente de *malicia* o *negligencia*..."
(aquí la cita anterior de Barrachina).

"*Difícil es que esa malicia pueda apreciarse por el juez
solamente con el escrito inicial y los documentos que le han de
acompañar.* El Reglamento de Ultramar, también en esto
más acertado, hablaba de la facultad del Juez para autorizar
*y para continuar* el procedimiento, palabra ésta que, en nues-
tra ley, puede estimarse incluída en la de autorizar, pues cabe
autorizar el principio y autorizar la continuación. En todo
caso, los efectos de la responsabilidad del acreedor han de
resultar palpables en caso de oposición, ya en el mismo pro-
cedimiento con arreglo al art. 132, ya separadamente."
4 Morell, Comentarios a la Legislación Hipotecaria, págs.
110–111 (segunda ed. de la Editorial Reus de 1930).

El art. 132 se refiere a las cuatro causas por las cuales
se suspende el procedimiento sumario: (1) procedimiento cri-
minal por falsedad del título hipotecario, (2) tercería de

dominio, (3) cancelación de hipoteca otorgada por el ejecutante, sus causantes o causahabientes y (4) hipoteca constituída en garantía de cuentas corrientes, cuando la libreta que presenta el deudor arroja un saldo distinto del que resulte de la presentada por el acreedor. (Énfasis provisto.)

Roca Sastre, hoy reconocido como uno de los más grandes hipotecaristas de todos los tiempos, al referirse a la indemnización de daños y perjuicios que provee el art. 131 de la Ley Hipotecaria española (169 del Reglamento nuestro) dice así:

"El carácter sumario—pues en el fondo hay sólo una actuación unilateral del acreedor—hace precisa esta prevención, pues *puede ocurrir que el acreedor haya percibido a cuenta una parte del importe del crédito* sin que ello se trasluzca en los documentos presentados, a pesar de lo cual continuará el procedimiento en curso, sin que pueda entorpecerse por la demostración de la inexactitud o falsedad, salvo cuando haya servido de base para la admisión de la querella criminal." (Énfasis provisto.) IV Roca Sastre, Derecho Hipotecario 835 (quinta ed. de la Casa Editorial de 1954).

Examinada tanto la disposición concernida, como un conjunto apreciable de criterios analíticos, esparcidos en diferentes épocas de la glosa hipotecaria, resulta claro que la acción de daños y perjuicios, bien sea por negligencia o malicia, en cuanto a un ejecutivo sumario hipotecario se refiere, queda circunscrita: (1) a "la fiel exposición de los hechos y circunstancias que ha de apreciar el Juez para autorizar el procedimiento y continuarlo", (art. 169 del Reglamento); (2) consistiendo la malicia en una "intención dolosa, ánimo de perjudicar a otro, faltando a la verdad en los hechos y ocultando lo que debe decirse sincera y honorablemente", (Barrachina); (3) "malicia que, *a priori*, no cabe discernir, porque muchos de sus matices y relieves se escaparían del juicio", (Barrachina); (4) malicia que no "pueda apreciarse por el Juez solamente con el escrito inicial y los documentos que le han de acompañar", (Morell); como lo sería en el caso

"que el acreedor haya percibido a cuenta una parte del importe del crédito, sin que ello se trasluzca en los documentos presentados", (Roca Sastre).

La glosa española ha interpretado el concepto de "negligencia" que contiene la disposición del art. 169 de nuestro Reglamento hipotecario, como algo equivalente a "culpa lata", siguiendo el conocido aforismo latino *culpa lata dolo equiparatur*, o sea, aquel caso extremo de culpa que correspondería con el dolo. En este sentido, Jaime Guasp, en su obra antes citada, a las págs. 71, 72 y 73, se expresa de la siguiente manera: "Constituye en la actualidad uno de los motivos de inspiración de la nueva orientación procesal el principio de la buena fe y los que con él cabe considerar relacionados: el deber de colaboración de las partes, y, sobre todo, el deber de decir verdad, acerca del cual, en los últimos tiempos, se ha acumulado una considerable bibliografía.

"De este principio de la buena fe, alguna manifestación es posible hallar en nuestros textos y en las resoluciones de la jurisprudencia, pero no existe una formulación expresa de él, ni, lo que es peor, cabe sostener con fundamento que nuestro derecho procesal está inspirado en su espíritu de modo notable por sugestiones de este tipo. Tal omisión aumenta, sin duda, el interés de las indicaciones aisladas que se encuentran en nuestros cuerpos legales.

"Puede pensarse si uno de estos casos es el que se contiene en el art. 131 de la Ley Hipotecaria, regla segunda, *in fine*, según la cual, 'el acreedor quedará sujeto a indemnizar cuantos daños y perjuicios irrogare al deudor o a terceros interesados por malicia en la exposición de los hechos y de las demás circunstancias que ha de apreciar el Juez para autorizar el procedimiento'. Este precepto trae su origen del art. 169 del Reglamento para la Ley Hipotecaria de Ultramar de 18 de julio de 1893 que disponía la sujeción del acreedor a responsabilidad 'por el solo acto de iniciar el procedimiento'.

"La redacción del artículo puede hacer suponer, efectivamente, por los términos empleados, que solamente al acreedor

de buena fe le está permitido acudir lícitamente a la tramitación privilegiada que se implanta.

"Por otra parte, si se analiza el precepto concreto y se ve cuál es su contenido, se observa que en esencia consiste en una imposición del deber de veracidad con respecto a los hechos y a las demás circunstancias que ha de apreciar el Juez para autorizar el procedimiento.

"Que se trate en este caso de una obligación de decir verdad, puede sostenerse, dada la redacción de la ley, que habla de malicia en la exposición de los hechos. La malicia consiste, sin duda, en una ocultación o falseamiento de la realidad a sabiendas de que se hace; fundamentalmente, pues, en una falta de veracidad, ya que el deber que impone ésta no exige la aportación de los hechos tal como ellos son, sino tal como cree sinceramente que son la parte que los alega. El Reglamento de la ley de Ultramar añadió a la malicia la negligencia, y no cabe duda que los casos extremos de ésta deben recibir un trato análogo a aquélla (*culpa lata dolo equiparatur*) ; pero tampoco ha de convertirse la exigencia de verdad en una sanción para la parte por descuido de la investigación de los hechos que figuran en el proceso.

"Ahora bien, del texto que se analiza se deduce que el mandato legal no sólo tiene una limitación subjetiva, sino también que en su aplicación al acreedor no se extiende a la total conducta procesal de éste, sino a una actividad parcial, siquiera sea ella la más importante en lo que se refiere al deber de decir verdad. Pone esto de relieve que la exigencia de la buena fe y este deber de decir verdad, parcialmente incluídos en el procedimiento hipotecario, responden para el pensamiento de la ley a una idea muy diferente de la conciencia, hoy ya unánimemente sentida, de su necesidad procesal.

"Un examen atento del precepto descubre que, lejos de haber pensado la ley en una sanción de tipo general contra el ejecutante que no ajuste su conducta a las exigencias de lo que pudieran llamarse las 'buenas costumbres procesales' con-

tiene un mandato, por su origen y por sus aplicaciones, de carácter mucho más restringido.

"En efecto, lo que se ha pensado en primer lugar al hacer la declaración que se comenta, ha sido, más que en el principio de la buena fe, que sólo indirectamente resulta protegido, en el restablecimiento de la igualdad de posición jurídica de ambas partes, igualdad que se estimaba destruída por la concesión al acreedor de la facultad de iniciar un procedimiento que ofrece al deudor (o a terceros interesados) tan pocas posibilidades de intervención o de defensa. Esto es lo que explica que siendo varios los sujetos procesales únicamente se prohiba expresamente la actividad maliciosa del acreedor, pues aunque sea cierto que éste es el que dispone de las armas más fuertes en el procedimiento, no lo es menos que las demás partes que intervienen pueden también dar lugar con su conducta igualmente maliciosa a acarrear perjuicios a otras personas. Si tal es el pensamiento legal, no parece dudoso que la idea específica de la buena fe procesal queda obscurecida, y únicamente se recoge aquí, no en méritos de su justicia intrínseca, sino como remedio o vía de compensación."

Veamos ahora, cuál ha sido la aplicación práctica de este cuerpo de principios realizados por nuestra jurisprudencia.

Haciendo uso estricto de los casos que versan sobre la nulidad de los ejecutivos sumarios hipotecarios, en relación con la última disposición del art. 169 del Reglamento, encontramos que con anterioridad al caso de *Figueroa* v. *Boneta*, 58 D.P.R. 811 (1941), nuestra jurisprudencia logró sistematizar el cuerpo de principios enunciados en la glosa española que antecede, con excepción de lo referente a la "malicia" o "negligencia", inspirándose en los propios términos del Reglamento. La necesidad de expresar los hechos determinantes de la certeza, la subsistencia y la exigibilidad del crédito, se estableció, entre otros casos, en los casos de *Llompart et al.* v. *La Corte de Distrito de Humacao*, 28 D.P.R. 226 (1920), cita precisa a la pág. 299, y *Geo. P. Plant Milling Co.* v. *Navas*,

22 D.P.R. 273 (1915), cita precisa a las págs. 281–82. La necesidad de determinar con certeza la competencia del tribunal, se estableció, entre otros casos, en el caso de *Sucn. Trías* v. *Porto Rico Leaf Tobacco Co.*, 50 D.P.R. 91 (1936), cita precisa a la pág. 95. La necesidad de señalar categóricamente las cantidades ciertas *cobradas* en concepto de intereses o a cuenta del capital, se estableció, entre otros casos, en el caso de *Martorell* v. *Crédito y Ahorro Ponceño*, 42 D.P.R. 655 (1931), cita precisa a la pág. 661.

En cuanto a la "malicia" o "negligencia" se refiere, nuestra jurisprudencia anterior no desarrolla, estrictamente hablando, los conceptos de "dolo" o "culpa lata", aunque sí hace uso de términos equivalentes a los mismos al referirse a "abuso intencional o negligente", o "fraude", *Polanco* v. *Goffinet*, 29 D.P.R. 120, (Hutchison), (1921), cita precisa a las págs. 126, 127, 140, y 143 (alegación falsa de haberse liquidado previamente un contrato de refacción agrícola garantizado con hipoteca, anulándose el ejecutivo ya que el ejecutante, al "tergiversar deliberadamente los hechos en la corte lo que equivalía a un fraude" incurrió en un abuso intencional o negligente; "exposición de hechos falsos e inexistentes", *Pontón* v. *Sucesores de Huertas González*, 42 D.P.R. 529, (Del Toro), (1931) cita precisa a la pág. 535 (alegación falsa de que los intereses que hacían ejecutable el crédito no se habían pagado); "omisión de" hechos indispensables para que el juez autorizara el procedimiento, *Martorell* v. *Crédito y Ahorro Ponceño*, supra, (Texidor), cita precisa a las págs. 657, 661, (alegación falsa de la cuantía líquida de la reclamación, que omitía señalar categóricamente las cantidades ciertas cobradas por intereses o a cuenta del capital, con anterioridad a la ejecución.

Como se ve, el concepto que falta por desarrollar expresamente, pues en una forma implícita se ha hecho en *Martorell* v. *Crédito y Ahorro Ponceño*, supra, es que la acción de daños que autoriza el art. 169 *in fine* queda circunscrita "a la malicia o negligencia en la fiel exposición de los hechos y las

circunstancias que ha de apreciar el juez para autorizar el procedimiento y continuarlo", verdadero fundamento de los dos únicos remedios que tiene el ejecutado en caso de "dolo" o "culpa lata": la nulidad con daños si la finca ha pasado a manos de un tercero o la reivindicación con frutos si la finca no ha pasado a tercero, no importa se le llame "malicia", "negligencia", "dolo", "culpa lata", "fraude", "inexistencia", "omisión", "error grave" o cualesquier otros términos equivalentes los unos a los otros.

En cuanto al concepto "error" es conveniente dejar esclarecido, que nuestra jurisprudencia ha equiparado el efecto del "error grave", a la "exposición de hechos falsos e inexistentes" —(malicia) (dolo)—*Pontón* v. *Sucesores de Huertas González*, supra, cita precisa a la pág. 535 y se ha negado a anular procedimientos ejecutivos en virtud de errores insustanciales en la fiel exposición de los hechos. *Delgado* v. *Banco Popular de Puerto Rico, Liquidador*, 55 D.P.R. 944, (Travieso), (1940), cita precisa a la pág. 948—"en el escrito inicial no se alegaron expresamente las sumas ciertas cobradas y pagadas al Banco acreedor con cargo al principal o por concepto de intereses"; *Torres* v. *Fernández*, 65 D.P.R. 622, (De Jesús), (1946), cita precisa a la pág. 635—errónea descripción del cómputo de los intereses; *Salas* v. *Cabassa*, 69 D.P.R. 457, (Marrero), (1948), cita precisa a las págs. 464–65 —liquidación insuficiente de los intereses y el crédito adicional para costas, lo cual reafirma que el "error" capaz de anular un procedimiento es aquél basado en la malicia o culpa lata, y no en el error, propiamente dicho.

Después del caso de *Figueroa* v. *Boneta*, supra, nuestra jurisprudencia ha pretendido responsabilizar al acreedor ejecutante por incluir en su escrito inicial intereses al mismo tipo pactado después del vencimiento. En ninguno de los casos se hace la menor referencia a la "malicia" o "negligencia" en la fiel exposición de los hechos. Es curioso observar la fuerte preocupación de alguna de estas decisiones porque cualquier prórroga al mismo interés anterior pactado resultara usura-

ria: *Goico* v. *Rodríguez*, 28 D.P.R. 530 (Hutchison), (1920), citado en *Figueroa* v. *Boneta*, supra; *Caraballo* v. *Registrador*, 48 D.P.R. 923 (Hutchison), (1935), cita precisa a las págs. 925, 927–42, citado también en *Figueroa* v. *Boneta*, supra; *De Aldrey* v. *Registrador*, 49 D.P.R. 56 (Del Toro), (1935), cita precisa a la pág. 58, citado también en *Figueroa* v. *Boneta*; *Toscano* v. *Pomales*, 60 D.P.R. 335 (Del Toro), (1942), cita precisa a la pág. 339. La Ley de Usura no era aplicable a las obligaciones contraídas con anterioridad a su vigencia: Ley de marzo 1ro. 1902, 31 L.P.R.A. 445, sec. 4592. Tampoco autoriza la nulidad.

Que ésta no es una cuestión regida por los artículos de nuestro Código Civil referente a la mora, y sí por la hipoteca legal tácita del art. 114 de nuestra Ley Hipotecaria, fue ya objeto de estudio por nuestra parte en la opinión separada que rendimos en el caso de *Valcourt* v. *Iglesias*, 78 D.P.R. 630 (1955). En cuanto al verdadero alcance del pacto limitativo en la responsabilidad por intereses, véase nuestra opinión disidente en *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108 (1957), págs. 123–47.

Ahora bien, en cuanto a la fijación del alcance jurídico que pueda dársele a la responsabilidad hipotecaria por intereses, ¿puede decirse que el juez está en la misma condición de indefensión en que se encuentra en caso de la ocultación dolosa u omisión inexcusable en la liquidación de la garantía? La respuesta tiene que ser categóricamente en la negativa.

Al limitar el art. 169 del Reglamento nuestro la responsabilidad de los daños causados por *malicia* o *negligencia* "a la fiel exposición de los hechos y circunstancias que ha de apreciar el Juez para autorizar el procedimiento", es claro, que si los hechos están fielmente expuestos y las circunstancias constan de los documentos presentados, no existe malicia ni negligencia y pierde su único fundamento la responsabilidad por daños. Ambos conceptos "malicia", "negligencia", se refieren exclusivamente a la ocultación dolosa de aquella parte del

crédito previamente saldado, a la liquidación de la responsabilidad hipotecaria.

El art. 169 de nuestro Reglamento habla de la *"cuantía líquida* de la reclamación", contrario a lo que dispuso la Ley Hipotecaria Española de 1909, art. 131, que empleó el término descriptivo más lato de "cuantía de la reclamación" y a lo que dispone la Ley Hipotecaria Española de 1946, art. 131, que emplea el término más riguroso de *"cantidad exacta* que por todos los conceptos sea objeto de reclamación".

La razón es obvia. La parte de la disposición que estamos examinando está concebida para proteger al Juez que ha de intervenir en el procedimiento, de cualquier intención dolosa o inexactitud culposa en la *cuantía líquida* de la reclamación, hechos que no traslucirían de los documentos a él presentados. El art. 170 le impone al juez la obligación de examinar el escrito inicial, la copia registrada de la escritura, y la certificación del Registrador de la Propiedad, expedida con posterioridad al vencimiento. De esos tres documentos el juez puede determinar, actuando ya judicialmente, la existencia de la garantía (certeza); que la misma no está cancelada de acuerdo con los libros del Registro (subsistencia) y que la misma está vencida (exigibilidad). Lo que no puede determinar es la *cuantía líquida,* a menos que no se la informe el propio ejecutante en su escrito inicial.

Contrario a lo que se supone, al autorizar un ejecutivo sumario hipotecario, el juez tiene amplias facultades para autorizarlo o denegarlo. Se trata de una función judicial, propiamente dicha, y no de una función puramente ministerial. González Alegre ha dicho que los poderes del juez para rechazar el escrito, "son mucho más amplios que en el proceso ordinario de la Ley Procesal"—Manuel González Alegre, Los Procedimientos Judiciales de la Ley Hipotecaria, pág. 94 (segunda ed. de José María Bosch de 1955). Si se trata de una función judicial, es indudable que la determinación legal de la extensión de la garantía hipotecaria por concepto de intereses, es una adjudicación judicial. El mismo

art. 170 faculta al juez para denegar el auto de requerimiento si el juez no considera cumplidos los requisitos, legales, necesarios a su expedición.

Este es un ejecutivo hipotecario que se anuló porque en él se cobraron intereses al tipo pactado después del vencimiento de la obligación garantizada—*Sucn. Ramírez* v. *Tribunal Superior*, 80 D.P.R. 148 (Saldaña), (1957), cita precisa a la pág. 151. No hay la menor alegación de dolo o negligencia en la fiel exposición de los hechos y circunstancias que hubo de apreciar el juez para autorizar el procedimiento ejecutivo, ni cuestión alguna relacionada con la liquidación de la garantía. El ejecutivo se anula por una determinación judicial sobre el alcance de la garantía hipotecaria por concepto de intereses, cosa que no era potestativa de la voluntad del ejecutante, sino de la aplicación de la ley a los hechos fielmente expuestos, que hace el juez al pasar sobre la expedición del auto de requerimiento. No hay duda, que en un caso como éste, el ejecutante no puede responsabilizarse por la previsión que contiene el art. 169 del Reglamento.

En este caso se vuelve a hacer referencia a los casos citados en la opinión de *Piovanetti*. Entre dichos casos está el caso de *Torres* v. *Fernández*, 65 D.P.R. 622 (De Jesús) (1946), cita precisa a las págs. 627–33, en el sentido, que sólo pueden cobrarse intereses al tipo convenido después del vencimiento, si las partes así lo han convenido. Que ésta no fue la doctrina, ni el punto de vista sostenido por el Juez De Jesús, lo demuestra su opinión posterior en el caso de *Díaz* v. *Quiñones*, 68 D.P.R. 249 (1948) cita precisa a la pág. 258. En este último caso, el pacto referente a los intereses dice escuetamente: "la cantidad prestada devengará intereses al ocho por ciento anual, los que deberán ser satisfechos por mensualidades vencidas." El pacto propiamente hipotecario dice así: "para garantizar el pago de los ochocientos setenta y cinco dollars cuarenta centavos prestados, un crédito adicional por doscientos dollars para intereses, y otro crédito más por doscientos dollars para costas, gastos, desembolsos y hono-

rarios de abogado en caso de reclamación judicial, don José Díaz López constituye hipoteca voluntaria a favor de don Ramón Díaz Román . . ." (Vide la hipoteca en los autos originales del caso civil número 9474). Se alegó para solicitar la nulidad el hecho de haberse cobrado por el ejecutante intereses por la cantidad de $326.82, al tipo convenido, en vez de los $200 asignados para intereses en la escritura, que era el verdadero pacto sobre intereses suscritos por las partes.

El Juez De Jesús desestimó la pretensión de nulidad, aplicando su anterior opinión de *Torres* v. *Fernández*, por el siguiente fundamento: "La fijación de un crédito para intereses tiene por objeto proteger a posteriores adquirentes de la finca o de un crédito hipotecario sobre la misma. Pero cuando se ejecutó la hipoteca no había posteriores adquirentes ni más acreedor hipotecario que Ramón Díaz Román, pues los herederos de José Díaz López, por ser la continuación de la personalidad del causante, no podían ser terceros con respecto al acreedor Ramón Díaz Román. Por consiguiente el cobro de $326.82 por intereses adeudados no invalida el procedimiento, a pesar de que en la escritura de hipoteca se fijaren $200 para esa acción. *Torres* v. *Fernández*, 65 D.P.R. 622." La hipoteca en este último caso venció el 31 de octubre de 1932 y los intereses se cobraron al mismo tipo pactado, 8 por ciento anual, hasta junio de 1933, o sea después del vencimiento.

Por las razones expuestas me veo obligado a disentir de cualquier resolución denegando la reconsideración solicitada.